CHARLES . HENRY PHELPS, Respondent, *v.* THE CABLE RAILWAY COMPANY, Appellant.

*Court of Appeals.    October 21, 1890.*

Reversing 47 Hun, 639, Mem.

1. *Pleadings.    Amendment.*—An amendment of a pleading, upon the trial, whether presenting, or not presenting, new matter, is permitted through the exercise of judicial discretion by the trial court, and is not the subject of review in the court of appeals.

2. *Contract.    Construction.*—Construction of a contract of employment and compensation in negotiating a contract for the sale and purchase of certain patent rights for the traction of cars by cable, and also of the latter contract.

Appeal from a judgment of the general term of the supreme court, affirming a judgment entered upon a decision of the court.

*Julien T. Davies*, for appellant.

*Noah Davis*, for respondent.

POTTER, J.—This action is brought to recover a balance alleged to be due to plaintiff from defendant, for services as a broker or middleman in negotiating the sale of certain patent rights belonging to the defendant for cable traction of cars upon street railways.

The complaint alleges that the defendant is a corporation organized under the laws of the state of California, and that prior to and on the 2d day of July, 1883, the defendant owned the right secured by various letters patent issued by the United States for cable traction, and which virtually gave the defendant the exclusive right and monopoly to a mode of moving street cars by cable, and that the defendant being desirous of selling said rights in all the territory of the United States lying east of the 106th meridian of west longitude, for the sum of $400,000, employed the plaintiff to procure a purchaser of the same for that sum, with the defendant's assurance of such monopoly and its promise to expend $100,000, if need be, in maintaining and defending such monopoly; that the defendant agreed, in the event of said sale by plaintiff, to pay him twenty per cent. upon the purchase price, or $80,000, out of the purchase price; that plaintiff, previous to July 2, 1883, effected an agreement for such sale to William P. Shinn, whom he introduced to said defendant, and between whom a formal contract was made for the sale of such rights, which is annexed to, and forms a part of, the complaint; that said contract between said Shinn and defendant provided that said Shinn should pay said purchase price in installments therein specified as to amounts and periods, and that in case of the failure to make such payments, the rights intended to be sold to said Shinn should revert to, and become the absolute property of, said defendant, and any payments under the contract should be forfeited to the defendant, and Shinn should have no right to sell said rights except to a corporation to be formed in the mode and with the limitations specified in the contract, to the effect that in the contingency that said Shinn failed to pay said sum as specified in the contract, that he might sell said rights to a corporation to be incorporated by his procurement for the purpose of dealing in said rights with a capital stock of $2,500,000 represented by 50,000 shares at fifty dollars each; said Shinn receiving for said rights

transferred to such corporation 35,000 of its· capital stock, and which stocks in excess of 26,000 shares were to be placed in escrow with the banking firm of Seligman & Co., to be delivered to Shinn or his assigns upon his or their depositing with said Seligman & Co. twenty dollars per share so long and until the purchase price shall have been paid to said defendant, and when said purchase price shall have been fully paid to defendant then any shares or money beyond the purchase price remaining with said Seligman & Co. shall belong to said Shinn, but if said installments of the purchase price are not fully paid to said defendant the 26,000 shares (being a majority of the stock) shall be the absolute property of the defendant, and that said Shinn should forfeit all the payments theretofore made, but is to be discharged from any further liability to pay the purchase price.

The complaint then alleges that simultaneously with the making and delivery of said contract the defendant executed and delivered to the plaintiff two contracts in writing (also annexed to the complaint) in which it was provided that plaintiff was to receive a commission of thirteen and one-third per cent. of any kind of consideration received by said Shinn or his assigns except in case of forfeiture; that the said Shinn performed his said contract with the defendant in all respects, and defendant received from Shinn the full consideration contracted and agreed to be paid in said contract, and that there has never been a forfeiture and that said Shinn has discharged every obligation in conformity with said contract, and the said defendant has received and accepted the consideration agreed to be paid as follows: the sum of one hundred and fifty-eight thousand one hundred and twenty-five dollars and seven cents ($158,125.07) and the balance in the stocks of said company (holding the said rights) as alternative payments, being compelled to this mode of payment for the reason that the said defendant did not perform its agreement to prosecute the infringers upon

said patented rights and to protect the said Shinn and his assigns·in the enjoyment thereof, by means of which a ready and successful sale of said stocks for cash was prevented and that the plaintiff became entitled to receive of defendant the sum of fifty-three thousand three hundred and thirty-three dollars and thirty-three cents ($53,333.33) of which the defendant had paid the sum of twenty thousand nine hundred and twelve dollars and one cent and the plaintiff demanded a judgment for the balance, $32,421.32, with interest.

In short, the plaintiff claims to be entitled to recover the balance of commissions unpaid upon a basis of thirteen and one-third per cent. upon the purchase price of $400,-000.

The answer, in substance, denies the employment to sell for $400,000 and the agreement to pay commissions upon that basis of twenty per cent., and alleges that the commissions were to be at the rate of thirteen and one-third per cent. upon such sum as was paid for the patented rights in cash, and that such commissions have been paid, and that plaintiff is not entitled to any commissions in case of forfeiture or upon any stocks which should revert to defendant through failure to pay the purchase price of the patented rights in cash.

It also substantially denies that the contract between it and Shinn was an alternative contract, admitting of payment by cash or stocks, and insists that it was conditional or permissive as to the organization of the company to take title to the patented rights and sell its stock to raise the money with which to make payments for the patented rights, and that a failure to make the payments therefor in cash was the forfeiture referred to in the contracts between plaintiff and defendant.

Upon the trial amendments were allowed to be made to the pleadings which do not seem to have materially changed the issues in the case or to have required much additional

8

or different evidence to be introduced subsequent to the amendments.

The amendment of the complaint presents no new matter; it presents the same matter with more particularity. But if this was not the case, the amendment was permitted through the exercise of judicial discretion by the trial court and is not, under the circumstances in this case, the subject of review by this court.

Under the pleadings as amended and the evidence, we are to consider whether this judgment should stand as the ultimate decision upon the rights of the parties. While this judgment is not between the principal contracting parties, yet the relation of the plaintiff to the contract between those parties makes it necessary to consider and construe that contract. The plaintiff had been for a little time prior to the 2d day of July, 1883, the means of bringing the defendant and one Wm. P. Shinn into negotiation and into a contract for the sale and purchase of certain patented rights for the traction of cars by cable.

At the outset the plaintiff was employed by the defendant to sell these rights or to find a purchaser thereof for the sum of $400,000, and the plaintiff was to be paid for so doing at the rate of twenty per cent., or $80,000 out of the purchase price. It would seem there were some difficulties in getting the negotiations into a fixed and definite form, and the defendant sent its agent from San Francisco to New York city invested with authority from the defendant to complete the pending negotiations and to reduce them to a written contract of sale and purchase between defendant and Shinn.

These negotiations occupied about a month's time, and were participated in by the plaintiff and the parties to the negotiations and their counsel. Upon the 2d of July, 1883, an agreement was reached and it was embodied in a written contract and signed by the contracting parties. That contract of course contained nothing in relation to the

commission or compensation to be paid the plaintiff for his services in the matter. That was wholly between the plaintiff and defendant, and with which Shinn, the other contracting party, had no concern.

The matter of plaintiff's commission was settled between plaintiff and defendant at or about the same time the con-tract of sale and purchase was signed, and was expressed in written contracts, as follows :

" NEW YORK, *July* 2, 1883.

" It is agreed between the Cable Railway Company and Charles Henry Phelps, that Mr. Phelps is to receive a commission of thirteen and one-third ($13\frac{1}{3}$) per cent. on any kind of consideration received from William P. Shinn or his assigns, under the agreement of even date herewith between the said Shinn and the said Cable Railway Com-pany, except in case of forfeiture.

" CABLE RAILWAY COMPANY,
        " By *Henry L. Davis, Att'y in Fact.*
" CHARLES HENRY PHELPS."

" NEW YORK, *July* 2, 1883.

" *Messrs. J. & W. Seligman :*

" Gentlemen—Mr. Charles Henry Phelps, whose office is in the Mills building, New York, is entitled to thirteen and one-third ($13\frac{1}{3}$) per cent. of all payments made the Cable Railway Company by William P. Shinn or his assigns, and you are hereby instructed to pass to ·the credit of Mr. Phelps, and to hold subject to his order, thirteen and one third ($13\frac{1}{3}$) per cent. of such payments as made.

" In case said Shinn or his assigns elect to pay up said sums before the same are due Mr. Phelps' thirteen and one-third ($13\frac{1}{3}$) per cent. is subject to the discount agreed upon equally with the rest.

" As to the payments made upon the twenty-six thousand shares under the agreement, you will pay Mr. Phelps his

share only when we draw ours, but the said Phelps in case the said Cable Railway Company have to take by reason of default or non-compliance of the agreement the said twenty-six thousand shares of stock, is not to receive any part thereof, nor any payment thereon, in the nature of a commission or otherwise.

" Your charges of escrow, etc., are not to be charged in any part to Mr. Phelps.

    (Signed)    CABLE RAILWAY COMPANY, .
              By *Henry L. Davis, Attorney in Fact.*
            CHARLES HENRY PHELPS."


These contracts, signed by plaintiff and defendant, refer to the written contract between Shinn and the defendant, and fix the rate of compensation which plaintiff is to receive at 13⅓ per cent. upon any kind of consideration received from Shinn under his contract with defendant, except *in case of forfeiture.*

The second paper is a letter of instruction, addressed to Seligman & Co. (who were under the second or alternative mode of raising the money to pay the purchase price if the first mode failed), to hold stocks and the moneys received upon a sale of stock, and was also signed by plaintiff and defendant.

The construction of these papers is or may be decisive of this case.

I do not deem it worth while to spend any time in considering the law applicable to brokers, middlemen or agents and their compensation.

Such contracts are legitimate, whether arising without express agreement, from the customs of business and the kinds of business and the locality in which it is contracted, or whether from express agreement.

An express agreement in respect to the time, manner and amount of compensation will control this as well as any other species of legitimate agency.

There is no dispute between the plaintiff and defendant in relation to the legality or the obligation of compensation in case payment for the rights was made in money. The difference between them relates to the amount of compensation to be paid to plaintiff by defendant under the written contracts or papers referred to. The stipulation, in express terms, fixed the rate of compensation or commissions at 13⅓ per cent. on any kind of consideration received from Shinn or his assigns under the agreement of even date herewith between the said Shinn and the said Cable Railway, except in case of forfeiture.

Without repeating the statements of the terms of the contract between Shinn and defendant, it seems very plain to me that that contract in its inception and in all stages of its development and completion had as its leading and distinctive principle the payment of $400,000 in money for the patented rights. The contract provides for such payment and such only, and Shinn agrees to make such payment, and when such payments have been made to defendant, Shinn becomes the owner of such rights, and has the right and power to transfer the same.

In case of his failure to make such payment in full and at the times and in the manner specified, Shinn should acquire nothing by any partial payments made, but should absolutely forfeit such payments.

It is very plain what the parties to the contract meant by the use of the word forfeiture in this connection. Payment of the purchase price would have satisfied and performed the contract of sale and purchase, and Shinn would have title to defendant's patented rights, and defendant would have received and become the owner of Shinn's $400,000, and the ends and objects of both parties to the contract would have been accomplished.

The plaintiff, from the beginning of the negotiations to their conclusion in the contract, was to be paid by a percentage upon and out of the agreed purchase money of

$400,000. The amount of the commissions was therefore fixed by express agreement, and would so remain until the agreement should be changed and the defendants should receive some other consideration than money for its rights. We have seen that the contract, so far as we have considered it, required payment of the purchase price in money in fixed installment, and the forfeiture provision followed and was applicable to it.

We will proceed now to consider the other or alternative part of the contract, as it is called, though, in my judgment, quite inaptly, so far as the kind of payment is concerned.

It appears from the correspondence between plaintiff and defendant prior to the coming of defendant's agent, Davis, to New York to arrange the details and to close the contract, that there were some doubts or misgivings whether Shinn would be prepared to pay the purchase price as required by the plan proposed by plaintiff and defendant, and some suggestions had been thrown out by plaintiff of a resort to some method of raising the purchase money, or a part of it. Probably these doubts led the parties up to the method provided in the so-called alternative part of the contract, which is introduced with a preface to the effect that " the Cable Railway Company further expressly covenants and agrees that said Shinn may provide for and discharge the *payment of said several installments as they become due, or before they become due, in the following manner, namely.*"

It will be observed that the object and purpose is still to make the payment of the purchase price in money and in the installments and at the times specified in the contract. It does not provide or contemplate any change in respect to the character or the terms of the payment. It is still money, and the same amount of it. It simply provides for a method or scheme of raising the money required, and the defendant yields somewhat of its rights to enable Shinn to employ the method. Without repeating particularly the

details of the scheme, it is sufficient to say that the method adopted was for the defendant to transfer its patented rights to a company incorporated for the purpose of taking the title thereto and to dispose of the stock of the corporation, or a portion sufficient to complete the payment of the purchase money.  When that was accomplished, the stock unsold was to be delivered to Shinn, but until such time the money realized upon the sale of the stock was mainly to be paid to defendant, and the defendant was to hold a majority of the stock, thus securing the control of the corporation holding the title to the patented rights.  The moneys to be realized by a sale of the minority of the stock at its par value would have easily completed the amount unpaid of the $400,000.  There are other provisions in the alternative portion of it that tend to the same conclusion.

It provided again in a later portion of the main contract and following the provision authorizing the creation of a corporation and the issuance and disposition of the stock to raise the money to pay the purchase price of the patent rights, that "in case the said Shinn fails to pay *said install-ments or any of them as they become* due, that said shares of stock remaining with Seligman & Co. shall become the property of said defendant and the said Shinn forfeit as a penalty to said defendant all the payments he shall have made prior to said default."

It seems very conclusive from this provision that the taking of the stock was not intended as a payment or to operate as a payment, for if it was to have that effect, there was and could be no default in payment and no conceivable reason would exist why Shinn should forfeit all the payments in money theretofore paid.  Besides, Shinn was constantly asking and the defendant was as often granting, extensions of time to pay the balance of the purchase money, and both parties hoping and expecting upon the sale of stock to realize sufficient money to complete the payment required by the contract.

This construction receives countenance from the paper signed by plaintiff and defendant and addressed to Seligman & Co. That paper, though signed by plaintiff and defendant, is claimed not to be a contract between plaintiff and defendant because it is in form and was intended to be a letter of instruction to Seligman & Co. It is not necessary that it be held to be a contract. However that may be, it is a clear admission of the relation between plaintiff and defendant as to plaintiff's right to commissions. It distinctly states that plaintiff is entitled to $13\frac{1}{3}$ per cent upon all payments made defendant by Shinn, and Seligman & Co. are directed to place the per cent. upon such payments to the credit of plaintiff. The defendant, as we have before seen, was entitled to have 26,000 shares of stock under its control until the whole purchase money was paid. And if the stock was sold down below the 26,000 shares the defendant might repay for stock enough to make the 26,000 shares or retain the money that it had sold for, and if defendant elected to do so, it would be a payment in money and the plaintiff be entitled to commissions upon it. And the paper thus signed by both parties proceeds to state that Phelps "in case the said Cable Railway Company have to take by reason of default or non-compliance of the agreement the said 26,000 shares of stock, is not to receive any part thereof nor any payment thereon in the nature of a commission or otherwise."

There certainly could be no sense or propriety in saying that the defendant had to take the 26,000 shares by reason of default or non-compliance with the contract, if the contract provided for the taking the 26,000 in performance and fulfillment of the contract. But whether the 26,000 shares be in performance of the contract or otherwise, the paper thus signed explicitly states that plaintiff "is not to receive any part thereof nor any payment thereon in the nature of *commissions or otherwise.*"

The contention that the stocks, which I think were held in order to enable the defendant to control the operation

of the corporation holding the patent rights, was a payment upon, or a substitute for, the $400,000, is entirely inconsistent with the purpose and language of the contract under consideration.

We conclude that the taking of such of the stocks by defendant as remained unsold was not, in any just view of the contract, a payment to the defendant for its patent rights.

The contract between the plaintiff and defendant fixed the rate of compensation at thirteen and one third per cent upon any kind of consideration received under the agreement between Shinn and defendant.

That stipulation is subject to the main contract which we have been discussing. As we have seen, that contract, in every aspect, called for money only. Upon the money paid under that contract the plaintiff was entitled to his commission. If the parties, however, should in the future agree to receive any other consideration than money in payment, the plaintiff was to have commissions upon such consideration. But before any claims upon any other consideration could arise under the contract, the parties must agree to the new consideration and the defendant must have *received* it.

We have endeavored to show that under the main contract the consideration was to be money only.

The trial court, moreover, has expressly found "that the defendant did not receive from said Shinn the full consideration in money or equivalent contracted to be paid in said contract of sale."

It seems to me that as a matter of law the contract between Shinn and defendant called for payment in money and that the word forfeiture, as employed in both views of the contract, meant the failure of Shinn to pay in money. If, therefore, the judgment appealed from rested solely upon the performance of the contract between defendant and Shinn, it could not stand, as thus construed.

But it is urged that the judgment can be supported upon another and quite distinct ground, viz.: that the contract

contained a covenant that defendant should secure, or endeavor to secure, to said Shinn, or his assigns, the exclusive enjoyment of the monopoly imported by said letters patent in and for the territory specified in the contract and sold to said Shinn by promptly and vigorously instituting and prosecuting to final judgment, or to the satisfaction of said Shinn, or his assigns, all infringers of said patents; and the learned trial court has found that the defendant neglected and failed to prosecute to trial or to judgment any infringers within the territory covered by the said contract, or to enjoin or to stop said infringers, and that by reason of such failure and neglect said Shinn and said syndicate *elected not to avail themselves of their option to purchase the remainder of said stocks.*

There was no question about the title of the defendant to the patents and of its right to sell at the time the contract was made with Shinn of that which by such contract it undertook to sell; and upon that subject the trial court found that the defendant was then " the owner of the exclusive right in and to said inventions and to said letters patent in and for, and over said territory, and fully competent to sell, assign and transfer the same, as was provided to be done by said agreement.

The defendant by the contract with Shinn undertook to secure, or endeavored to secure, to him, or his assigns, " the exclusive enjoyment of the monopoly imported or intended to be enjoyed by said letters patent " in the territory embraced within the contract of sale " by promptly and vigorously instituting and prosecuting to final judgment or to the satisfaction of said Shinn, or his assigns, all infringers thereof " and to defend him or them, etc., to be conducted by attorneys and counsel to be mutually agreed upon by the defendant and Shinn, or his assigns, but not to institute any suit after July 1, 1885 ; and for the purpose of rendering such provision more effectual, the defendant agreed to enter into a bond obligating it to prosecute and defend such

litigation as before mentioned whenever Shinn, or his assigns, might require the same to begin.    The bond was made, and attorneys and counsel were agreed upon by the defendant and Shinn to commence, prosecute and defend such litigation.    Several actions were commenced.    And the charge is made that the defendant failed to prosecute them vigorously and to judgment as it agreed to do.

Although Shinn and his associates had paid upwards of $158,000 of the purchase price upon the contract, he did not question the right of the defendant to treat the amount so paid as forfeited, but consented to the taking by the latter of the stock as upon his failure to perform the contract. This fact, however, would not prejudice the plaintiff if performance by Shinn was prevented by the defendant or by its failure to perform the contract on its part.    And the court found that various obstacles arose and existed over which the defendant had no control, and for which it was not responsible, which prevented Shinn and his assigns from disposing of the stock, and in that way of obtaining the means to make payment.    Some of these obstacles seemed to have been in the way of constructing a cable road in the city of New York, which Shinn and his associates sought to have accomplished by another company organized for the purpose.    The embarrassment of that enterprise by hostile legislation taken in this state, or want of that which was favorable and interruption in obtaining the requisite authority or permission to build a road in that city, were amongst those obstacles for which the defendant was not responsible.    The court also found that as an inducement to Shinn to enter into the contract, the defendant, at the time of its execution, stated that the Market Street Cable Road, in San Francisco, was an infringer of the patents, and that the defendant would immediately stop it; that the defendant failed to do so; and wholly failed to bring to trial or final judgment any action against infringers within the territory covered by the contracts; that although the

defendant's representations as to its patents were true, there were numerous infringements of them; and that by reason of such failure and neglect, Shinn, and his associates, after purchasing more than 9,000 shares of the stock, elected not to avail themselves of their option to purchase the remainder. And as conclusion of law the court determined that the purchase of stock by the "syndicate was prevented by the non-performance by the defendant of the contract in relation to prosecuting infringers and conveying a monopoly."

The conclusion in the sense and effect sought to be given to it by the court was not supported by evidence. There is no claim founded upon the evidence that actions were not commenced against alleged infringers, but that there was a failure to vigorously prosecute them to judgment. The principal complaint made in that respect had relation to the Market Street Cable Road in San Francisco. That was not within the territory to which the contract related. The design was to give to Shinn the exclusive right afforded by the terms of the contract within that part of the United States east of the 106 meridian (Greenwich), except in Cook County, Illinois, Alleghany and Philadelphia counties, Pennsylvania, and St. Louis county, Missouri. And upon a fair interpretation of the contract did not require the defendant to prosecute for alleged infringements outside of the territory, within its provisions, except as therein specified. It however appears that an action was brought by the defendant against the Market Street Co., and upon the evidence the conclusion was not warranted that it had unduly failed to prosecute that suit, although it had not reached a conclusion. And so far as related to the bringing of actions for infringements, the attorneys and counsel agreed upon by the defendant and Shinn were subject to the direction of the latter. Those attorneys resided in the city of New York, and the one of them who was a witness on the trial testified that they did all they were requested to do by Shinn and the person who represented him and the syndi-

cate ; and it appeared that the defendant furnished all the money it was called upon to supply to pay the expenses of such litigation.   The court upon that subject found that the " prosecutions were conducted wholly at the expense of the defendant to an amount reasonably required to properly institute the litigations and defray the expense thereof."

The question whether the defendant failed to do what was required of it by way of performance of the Shinn contract was primarily a matter between the parties to that contract.   And any default of the defendant in that respect was not available to the plaintiff unless it prevented or caused its failure to make the payment of the purchase money provided by it.

Shinn had the right at his election to decline to make payment and submit to the forfeiture provided for without liability to make any further payment.   He did exercise this right.   And the reason for it appears in the finding of the court to the effect that Shinn and his assigns were prevented from obtaining the means to make payment by obstacles over which the defendant had no control.

In view of the fact so found, the evidence does not warrant the conclusion, that he was prevented from proceeding by any act or default of the defendant.

The right of the plaintiff must rest upon his contract; and he evidently relied upon the construction contended for in his behalf to support his claim for commissions upon a sum beyond the amount of the money paid to the defendant upon the Shinn contract.

As his claim is not supported by the interpretation given to his contract with the defendant, the plaintiff was not entitled to recover.

The judgment should be reversed, and a new trial granted, costs to abide the event.

All concur, except HAIGHT and BROWN, JJ., who dissent.